Filed 5/31/2016

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>VICENTE RUIZ GARCIA,<br><br>    Defendant and Appellant. | H040914<br>(Santa Cruz County<br>Super. Ct. No. F24718) |

Defendant Vicente Ruiz Garcia was convicted by jury trial of 16 counts of forcible lewd acts on a child (Pen. Code, § 288, subd. (b))[1] and sentenced to 86 years in state prison. On appeal, he claims that (1) the convictions are not supported by substantial evidence because the evidence at trial did not link each act of abuse to a particular one of the specific one-year periods alleged in the second amended information, (2) there is not substantial evidence of force or duress, (3) the trial court prejudicially erred in denying his motion to suppress his statements to the police, (4) the trial court prejudicially erred in admitting expert testimony about child sexual abuse accommodation syndrome (CSAAS), and (5) there are clerical errors in the abstract of judgment and minutes that must be corrected.

---

[*]    Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of sections III(B), III(C), and III(D).

[1]    Subsequent statutory references are to the Penal Code unless otherwise specified.

The Attorney General concedes that the errors in the abstract and minutes must be corrected, and we agree. In the published portion of this opinion, we conclude that it was not necessary for the prosecution to prove that specific charged acts occurred during each of the one-year periods alleged in the information since the information alleged only that the acts occurred "on or about" each of those periods. In the unpublished portions of the opinion, we reject the remainder of defendant's contentions. Consequently, we affirm the judgment and order the abstract and minutes corrected.

## I. Factual Background

In 2012, Jane Doe told her mother that defendant, her father, had sexually abused her, and her mother confronted defendant. Defendant admitted the abuse and told Jane's mother that "he needed help and he didn't know why he had done it . . . ." The abuse stopped.

On May 8, 2013, Jane's mother called 911 after defendant became "very drunk and he got very aggressive." A deputy from the San Benito County Sheriff's Department responded to the "domestic disturbance" call. The deputy spoke with Jane, and she told him that defendant had touched her private parts from the time she was five years old until she was 10 years old. The deputy contacted San Benito County child protective services (CPS). After speaking with Jane, the CPS worker removed her from the home and contacted the Watsonville police, as the touchings had not occurred in San Benito County.

On May 10, 2013, two Watsonville police officers went to the San Benito County CPS offices and met with defendant there. While they were meeting with defendant, another police officer was interviewing Jane, who had been brought by CPS to the police department in Watsonville. Defendant admitted that he had sexually abused Jane, and Jane provided details of the abuse to the police. Although defendant admitted to just a few incidents of nonforcible abuse and insisted that they occurred in a single one-year

2

period in Chowchilla, Jane told the police about years of forcible abuse that began in Mexico when she was five years old and continued in Chowchilla and Watsonville until she was 10 years old.  Defendant was arrested at the end of his police interview.

## II.  Procedural Background

The second amended information charged defendant with 16 counts.  Four counts were charged for each one-year period beginning with September 2007 through September 2008 and ending with September 2010 through September 2011.  The jury returned guilty verdicts on all 16 counts, and the court committed defendant to state prison for a term of 86 years.  Defendant timely filed a notice of appeal.

## III.  Discussion
### A.  Sufficiency of the Evidence

Defendant contends that there is not substantial evidence in the record to support the 16 counts on which he was convicted.  He also contends that there was insufficient evidence of force or duress.

### 1.  Jane's Police Interview

Jane told the police that defendant had begun touching her vagina when she was five years old and they were living in Mexico.[2]  There were a couple of touchings in Mexico.[3]  After the family moved to Chowchilla, defendant continued to abuse her, and there were a lot of incidents of abuse in Chowchilla.  While they were in Chowchilla, defendant touched her vagina and showed her his penis.  He perpetrated the abuse when her mother was cooking, taking a shower, or washing clothes.

---

[2]     Videos of Jane's police interviews were played for the jury at trial.

[3]     The touchings in Mexico were not charged in this case.

3

The family moved to Watsonville while Jane was in second grade, and the abuse got worse and continued when she was in third grade and fourth grade. The abuse was frequent in Watsonville; it happened almost every time her mother took a shower. Her mother took a shower every couple of days. Jane estimated that the abuse happened about 200 times in Watsonville when she was in second, third, and fourth grades. Defendant would not only touch her private parts, but he would also grab her hand and "make" her touch his penis when they were in the car together. Three times he forced her to touch his penis by grabbing her hand and putting it on his penis. It was in Watsonville that he began putting his penis on her vagina. He would pull her pants down, push her onto a bed or the floor, pull his pants down, get on top of her, and put his penis on her vagina.

During these incidents of abuse, defendant would grab Jane's hands really hard so that she would not move; this hurt her. A couple of times he covered her mouth so that she could not scream. He also told her not to scream or he would do something to her mother, and he threatened to hurt her mother if she did not permit him to abuse her.

In 2012, when Jane was 10 years old, she told her mother about defendant's abuse. Jane's mother confronted defendant, and he admitted the abuse. He stopped abusing Jane.

## 2. Jane's Trial Testimony

Jane was a very reluctant witness at trial. Asked whether defendant had abused her in Mexico, she said "I don't want to talk about it." Jane explained that she thought defendant "is a good dad," and "I don't want him to be in jail . . . ." Nevertheless, she confirmed that she had told the truth to the police during her May 2013 interview and during a subsequent interview a couple of months later. Jane intermittently exhibited reluctance to testify about the abuse: "I don't want to talk no more."

Jane testified at trial that she came to the United States and moved to Chowchilla when she was six years old. The family subsequently moved to Watsonville. Jane

4

confirmed that defendant had touched her vagina, displayed his penis to her, put his penis on her vagina, and forced her to touch his penis. She recalled one or two incidents in Watsonville where defendant forced her to touch his penis in the car. Jane recounted that the touchings occurred both lying down and standing up. Jane could not remember how many times defendant abused her in Chowchilla. She did remember that the abuse in Chowchilla occurred when her mother was cooking or in the bathroom. Once, she could not remember at what location, defendant touched her chest.

Although she said she did not remember how many times defendant had touched her, she recalled telling the police that it was about 200 times. However, she testified that she now thought that "it wasn't that much." Jane remembered telling the police that the abuse had begun in Mexico when she was five years old, but on cross-examination she said that the event in Mexico was just defendant trying to touch her, "but I didn't let him . . . ."

Jane confirmed that in Watsonville defendant would "grab my hands really hard so I couldn't move" or "get away." This "hurt." Sometimes he would lie on top of her and cover her mouth so that she could not scream. He told her not to tell anyone about the abuse. However, Jane testified that defendant had never told her that he was going to do something to her mother.

On cross-examination, Jane testified that there were just three instances of abuse in Chowchilla, and defendant did not hold her down or threaten her when he abused her in Chowchilla. However, she also testified that he would "grab my hand" in Chowchilla. She reiterated that he had held her down when he abused her in Watsonville. She also testified on cross-examination that there were at least five instances of abuse in Watsonville. But she testified both that he held her down every time and that he held her down just once or twice and did not threaten her.

5

### 3. Defendant's Admissions

During his police interview, defendant admitted that he had sexually abused Jane five times in Chowchilla and two or three times in Watsonville. In Chowchilla, Jane had touched his erect penis once while her mother was in the shower; twice he had touched her vagina with his hand; and twice he had placed his penis over her vagina. In Watsonville, defendant two or three times put his penis on Jane's vagina while her mother was in the shower.

### 4. Standard of Review

Our standard of review is well established. " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576, quoting *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319.) "[The] appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425; accord *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1237.) "Evidence is sufficient to support a conviction only if it is substantial, that is, ' "if it reasonably inspires confidence" ' [citation], and is 'credible and of solid value.' " (*People* v. *Raley* (1992) 2 Cal.4th 870, 890-891.)

### 5. Time Periods

Defendant claims that his convictions are not supported by substantial evidence because "it is virtually impossible to determine which of the alleged acts he committed" "during each one year period." He asserts that the evidence presented at trial did not satisfy the requirements of *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*).

In *Jones*, the six counts at issue each charged one event in a different two-month period. (*Jones*, *supra*, 51 Cal.3d at p. 303.) The victim of these counts testified that the abuse occurred once or twice a month during the charged periods. (*Jones*, at p. 301.)

6

The California Supreme Court held that the victim's generic testimony constituted substantial evidence supporting these six convictions. "[I]n determining the sufficiency of generic testimony, we must focus on factors other than the youth of the victim/witness. Does the victim's failure to specify precise date, time, place or circumstance render generic testimony insufficient? Clearly not. As many of the cases make clear, the particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction. [Citations.] [¶] The victim, of course, must describe *the kind of act or acts* committed with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe *the number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Jones*, at pp. 315-316.)

The *Jones* court also separately addressed whether the victim's generic testimony violated the defendant's due process rights. (*Jones*, *supra*, 51 Cal.3d at p. 316.) First, it held that reliance on generic evidence did not violate a defendant's due process right to notice. "We conclude that, given the availability of the preliminary hearing, demurrer and pretrial discovery procedures, the prosecution of child molestation charges based on generic testimony does not, of itself, result in a denial of a defendant's due process right to fair notice of the charges against him." (*Jones*, at p. 318.) Second, the court concluded that reliance on generic testimony did not deprive a defendant of his or her due

process right to present a defense. (*Jones*, at pp. 319-320.) Finally, the court held that a defendant's right to a unanimous verdict was ensured by unanimity instructions. (*Jones*, at p. 321.)

Defendant contends that the evidence presented at trial was insufficient to support his convictions on the first eight counts because the evidence did not link the acts of abuse to the time periods alleged in the second amended information for those counts. The second amended information, which was the operative pleading at trial, alleged that each set of four counts occurred "[o]n or about or between" a one-year period corresponding to Jane's ages of six, seven, eight, and nine. The first four counts were alleged to have occurred when Jane was six years old, and the second four counts were alleged to have occurred when Jane was seven years old. Jane testified at trial that she was born in September 2001. Jane and her mother both testified at trial that the family moved to Chowchilla from Mexico when Jane was six years old. In defendant's statement to the police, which was admitted into evidence at trial, he told the police that the family moved to Chowchilla when Jane's younger sister was seven months old. Jane's mother testified that Jane's younger sister was born in late July 2007. Hence, they moved to Chowchilla in February or March 2008, when Jane was six and a half years old. Jane testified that she was six or seven years old when they lived in Chowchilla, and her mother testified that the family lived in Chowchilla for "[m]ore than a year and a half."[4] This evidence established that Jane lived in Chowchilla for all or nearly all of the year when she was seven years old.

The first four counts charged a period that included only approximately the first seven months of the "[m]ore than a year and a half" that the family lived in Chowchilla.

---

[4]    Jane told the police that she was in first grade when they lived in Chowchilla and that she moved to Watsonville while she was in second grade. She also told the police that she went to second, third, and fourth grades in Watsonville. Jane testified that she was 12 years old and in the sixth grade at the time of the January 2014 trial.

8

The second four counts charged a period during which the family lived primarily in Chowchilla, but possibly lived in Watsonville toward the end of the period. As a result, the Chowchilla events of abuse were spread over the time periods charged in both the first and second sets of four counts. No evidence was presented by the prosecution distinguishing between events of abuse during the one-year period when Jane was six years old and living in Chowchilla (September 2007 to September 2008) and events of abuse during the one-year period when Jane was seven years old and still living in Chowchilla (after September 2008). The only evidence of the total number of events of abuse that occurred while they lived in Chowchilla was Jane's statement to the police that there were "a lot" of incidents of abuse in Chowchilla and defendant's admission that there were five events of abuse in Chowchilla. Neither Jane's statement nor defendant's admission distinguished between the two periods of time. Jane also did not give any statements or testimony about the frequency of the abuse in Chowchilla.

Defendant argues that reversal of these eight counts is required due to insufficiency of the evidence because the evidence did not permit a determination of "how many acts occurred during each one year period." The Attorney General contends that it was not necessary for the prosecution to present evidence that the number of acts charged during a specific one-year time period actually occurred during that one-year time period. She contends that the prosecution was required to show only that all of the acts occurred during the applicable limitations period. In her view, the prosecution's failure to show that four acts occurred while Jane was six years old and four acts occurred while Jane was seven years old, as charged in the second amended information, was merely a "variance between the pleading and the proof" that defendant forfeited by failing to object on that basis below and that would not in any event establish insufficiency of the evidence.

Defendant did not forfeit this contention. He demurred on due process grounds to the first amended information's use of one-year periods without otherwise distinguishing

9

between the counts. The prosecution responded that it was enough for the information to allege that the offenses occurred during the applicable limitations period. His demurrer was overruled. Defendant also filed a section 995 motion challenging the sufficiency of the evidence presented at the preliminary examination to support the first eight counts. He claimed that the evidence was insufficient to show that four counts occurred when Jane was six years old or that four counts occurred when she was seven years old. His motion was denied. Since defendant demurred on this ground and brought a section 995 motion on this ground, we cannot credit the Attorney General's suggestion that defendant's contention was not "preserved" because he failed to bring it up below.

Defendant claims that the evidence is insufficient to support the first eight counts because no evidence linked particular acts of abuse to those specific one-year periods. Such evidence was not required. "The precise time at which the offense was committed need not be stated in the accusatory pleading, but it may be alleged to have been committed at any time before the finding or filing thereof, except where the time is a material ingredient in the offense." (§ 955.) "The law is clear that, when it is charged that an offense was committed 'on or about' a named date, the exact date need not be proved unless the time 'is a material ingredient in the offense' (Pen. Code, § 955), and the evidence is not insufficient merely because it shows that the offense was committed on another date." (*People v. Starkey* (1965) 234 Cal.App.2d 822, 827; accord *People v. Peyton* (2009) 176 Cal.App.4th 642, 660.) Time was not a "material ingredient" (§ 955) in any of the offenses. And *Jones* says nothing inconsistent with these principles.

The premise for defendant's contention is nothing more than a pleading error. The second amended information alleged the counts by reference to one-year periods corresponding to Jane's age at the time of the events, but the evidence at trial did not distinguish between the acts of abuse by reference to one-year periods or to Jane's age at the time of the events. The evidence at trial distinguished between the events only by reference to whether they occurred in Chowchilla or in Watsonville. This pleading error

10

did not render the evidence insufficient because the second amended information used "on or about" in reference to these one-year periods, making it unnecessary to establish when the offenses actually occurred. The jury was not obligated to match the counts to one-year periods. Indeed, it was instructed that "[t]he People are not required to prove that the crime took place exactly on that day but only that it happened reasonably close to that day." The jury was also given a proper unanimity instruction that permitted it to convict defendant of all of the charged counts if "[y]ou all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."[5] The evidence at trial established that there were far more than 16 events of abuse that occurred during the four-year period encompassed by the counts charged in the information.[6] Since the jury could have concluded that defendant committed all of the acts Jane described, which was far more than 16, and reached a unanimous verdict on that

---

[5] The jury was instructed as follows on unanimity: "The defendant is charged with committing lewd acts on a child by force/violence/fear/duress in Counts 1-16 sometime during the periods of September 28, 2007 to September 27, 2011. [¶] September 28, 2007 and September 27, 2008 = Counts 1-4 [¶] September 28, 2008 and September 27, 2009 = Counts 5-8 [¶] September 28, 2009 and September 27, 2010 = Counts 9-12 [¶] September 28, 2010 and September 27, 2011 = Counts 13-16 [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless: [¶] You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense; [¶] OR [¶] You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."

[6] Jane told the police that the abuse occurred approximately every couple of days during the years they lived in Watsonville until she disclosed the abuse to her mother when she was 10 years old.

11

basis, the incongruence between the dates alleged in the second amended information and the evidence produced at trial was immaterial.[7]

## 6. Force and Duress

Defendant also challenges the sufficiency of the evidence to show that he used force or duress to perpetrate the abuse.

" '[D]uress as used in the context of section 288 [means] a direct or implied threat of force, violence, danger, *hardship* or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004.)

"A defendant uses 'force' if the prohibited act is facilitated by the defendant's use of physical violence, compulsion or constraint against the victim other than, or in addition to, the physical contact which is inherent in the prohibited act." (*People v. Bolander* (1994) 23 Cal.App.4th 155, 164 (Mihara, J. concurring) (*Bolander*); accord *People v. Soto* (2011) 51 Cal.4th 229, 242.) "[A]n act is forcible if force facilitated the act rather than being merely incidental to the act." (*Bolander*, at pp. 164-165.) "[A]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves" are sufficient to support a finding that the lewd act was committed by means of force. (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005 (*Alvarez*).)

Defendant used duress by means of threats to facilitate his abuse of Jane. During the earliest acts of abuse in Mexico, when Jane was five years old, defendant "would always tell me that he was gonna do something to my mom if I didn't let him do something to me." This threat made Jane "scared," and she had dreams about defendant

---

[7] Defendant claims that the evidence is insufficient to support the other eight counts for the same reason: the evidence presented at trial did not distinguish between the two one-year periods with respect to the acts of abuse that occurred in Watsonville. This claim fails for the same reason that the claim as to the first eight counts fails.

12

"killing my mom." Defendant continued to make similar threats. He warned her not to scream or he would "do somethin to my mom." Because of these threats, Jane "let him do whatever he wanted to because I was really nervous he was gonna do something to my mom." Jane's decision to disclose the abuse came about because she "got tired of my dad telling me that he was gonna do something to my family." Defendant also repeatedly used force to perpetrate much of his abuse of Jane. He grabbed her hands so hard that it hurt in order to keep her from moving while he touched her vagina. He forced her to touch his penis by grabbing her hand and placing it on his penis. Defendant was able to place his penis on Jane's vagina only because he had "push[ed]" Jane down on the floor and gotten on top of her. Although Jane attempted to push him off of her, she was unsuccessful because he "wouldn't get up." Defendant also covered her mouth to keep her from screaming.

Defendant's threats to harm Jane's mother were plainly sufficient to cause a reasonable person to permit acts of abuse that she would not otherwise have permitted. After defendant had repeatedly threatened to harm Jane's mother, all of his subsequent acts of abuse were facilitated by the duress engendered by these threats. The fact that he also grabbed, held, and restrained Jane during many of the acts of abuse further supported the jury's verdicts. In light of the many acts that occurred in Watsonville and the jury's implicit finding that all of the acts alleged occurred, it is irrelevant whether all of the Chowchilla acts were committed by force or duress. Substantial evidence supports the jury's findings that defendant's acts of abuse came within the provisions of section 288, subdivision (b)(1).

## B. Defendant's Statements To The Police

Defendant claims that the trial court prejudicially erred in admitting into evidence his statements to the police because he was in custody during the initial portion of his

police interview, before he was advised of his constitutional rights, and he did not subsequently voluntarily waive his rights.[8]

## 1. Background

A CPS worker met with defendant on the morning of May 10, 2013. The CPS worker did not ask defendant about the molestation allegations. When Watsonville police officers arrived at the CPS offices, the CPS worker introduced defendant to one of the police officers and then the CPS worker left the room. The police officer did not advise defendant of his constitutional rights because defendant was not under arrest and was free to leave. The police officer told defendant: "[Y]ou know that right now you're not under any obligation to talk to us, do you understand?" Defendant replied: "No, but that's fine." The officer repeated that "you're not under any obligation to speak with anyone," and defendant again responded "that's fine." The officer also told him: "if at any time you feel -- and if you don't feel well or you want to leave or -[-] or you don't want to talk with me" "it's cool, you can leave the room as you wish or you can -- if you don't want to talk about this, you tell me . . . ." Defendant responded: "No, it's fine. I'll -- I'll say what you ask me, I'll -- I'll answer."

Defendant proceeded to readily respond to the officer's questions about his family and to describe the domestic disturbance that had led to CPS's involvement. The officer told defendant that he had spoken to Jane and that the officer knew that defendant had "touched her" in the past. The officer asked defendant to be truthful. Defendant proceeded to provide a lengthy narrative with little prompting by the officer beyond "Mm-hm." Defendant said that he "used to drink a lot. And sometimes I didn't know what I was doing because of the damn alcohol." "I don't know what I did. If I ever

---

[8] After the initial portion of the police interview, the police left for a while. They returned and advised defendant of his constitutional rights and continued to interview him. A third portion of the interview followed the second one. Transcripts of these interviews were admitted into evidence at trial.

14

disrespected my daughter, forgive me." "I wasn't in my (five) senses." "My -- my wife is upset at me for the times that I would come home drunk and I wanted to grab the girl, maybe touch her private parts."

The officer told defendant "I don't want to arrest anyone," and defendant responded "I'm telling you the truth." The officer repeated "I'm not here to arrest anyone." Defendant said "if you are, it doesn't matter, you're within her rights." The officer told defendant that Jane "told me exactly what happened," and the officer wanted to "help your daughter get the help that she has needed." The officer told defendant that he knew defendant's wife had talked to him about Jane's allegations, and defendant responded: "I don't deny it, it is true." He repeated that he had touched Jane when he was drunk. The officer asked him if he had touched Jane's vagina, and he admitted that he had. He asserted that he had touched her over her pants in Chowchilla when she was nine years old. Defendant initially denied that he had ever put his penis on Jane's vagina, but he admitted that Jane had once touched his penis also in Chowchilla when she was nine years old. Defendant initially denied that there had been any touchings in Watsonville.

The officer at this point reiterated "don't feel that you're obligated to talk to me." Defendant responded: "I came to tell the truth." He went on to admit that his penis was erect when Jane touched it and that his wife had been in the shower when that event occurred. Defendant also admitted having "sexual feelings" when Jane touched his penis and when he touched Jane's vagina. And he admitted telling Jane not to say anything to her mother. He insisted that Jane had touched his penis just once.

At this point, the officer told defendant that he would be "right back" to ask "another question or two," and they took a break. The officer returned and advised defendant of his constitutional rights. Defendant acknowledged that he understood his rights, and he continued to respond to the officer's questions. Eventually, he admitted that he had put his penis over Jane's vagina, but he initially insisted that it was over her

15

clothes and happened only in Chowchilla. The officer continued to ask him about events in Watsonville, and defendant responded: "If my daughter said that, that's fine. It also happened in Watsonville." He denied using force or covering Jane's mouth. He denied that Jane had touched his penis in Watsonville, but he admitted that two or three times he had placed his erect penis over Jane's vagina in Watsonville while his wife was in the shower. He admitted to five events in Chowchilla. Once Jane had touched his penis; twice he had touched her vagina with his hand; and twice he had placed his penis over her vagina. He claimed that all of these events happened during the same year.

The officer took another short break, returned, and reminded defendant "of your rights." This final portion of the interview was very brief. Defendant denied that he had touched Jane in a car, and he denied that there were more than five touchings. At this point, the officer told defendant that he was "going to be arrested." Defendant expressed no surprise. Instead, he said "that's fine." The officer asked defendant "how did you feel talking to me?" Defendant responded: "I felt fine, I already said what I was going to say, and everything's all right." That was the end of the police interview.

Defendant moved in limine to exclude his statements to the police. He contended that the statements he made to the police prior to being advised of his constitutional rights were inadmissible because he was in custody during that initial portion of the interview.[9] Defendant also contended that all of his statements to the police should be excluded as coerced.

The trial court found that the initial portion of the police interview was not custodial because defendant was told that he did not have to speak to the officers, did not have to answer any questions, and was free to leave. The trial court also found that, after the initial portion of the police interview, defendant was properly advised of his rights

---

[9] The audio recording of the interview, which was in Spanish, is not part of the record on appeal.

16

and voluntarily and intelligently waived his rights. It therefore denied his motion to exclude his statements to the police. Transcripts of all three portions of the interview of defendant were admitted into evidence, and the audio recordings were played for the jury.

## 2. Analysis

Defendant claims that the trial court erred in concluding that he was not in custody during the initial portion of the interview.

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. . . . *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.)

"'Before being subjected to "*custodial* interrogation," a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."'" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1399-1400, italics added.) "An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.] Whether a person is in custody is an objective test; the pertinent inquiry is whether there was '"'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'"' [Citation.] [¶] Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the]

17

defendant's position would have felt free to end the questioning and leave' [citation]." (*Leonard*, at p. 1400.) "All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present." (*People v. Moore* (2011) 51 Cal.4th 386, 395.)

The trial court did not err in ruling that defendant was not in custody during the initial portion of the interview. The interview did not take place at the police station, but at the CPS offices. Defendant was repeatedly reminded that he was not under arrest, was free to leave, and did not have to speak to the police officer or anyone else. There were no indicia of arrest, and defendant was not restrained or confined in any way. The officer did not press defendant to answer his questions during the initial portion of the interview, and this portion of the interview was not particularly lengthy. In fact, defendant appeared eager to relate his story, and the officer simply encouraged him to do so. Since defendant was not in custody during the initial portion of the interview, the officer was not obligated to advise him of his constitutional rights.

Defendant asserts that a reasonable person would have believed that he was required to submit to the police interview in order to regain custody of his children. He bases this argument on his claim that he "was asked to come to a government office to meet with a government worker about his children." The record contains no evidence concerning how defendant came to be meeting with the CPS worker that morning. Nor is there any evidence that he was led to believe that submission to police questioning was necessary to regain custody of his children. The CPS worker did not ask defendant about the molestation allegations, and the police repeatedly told him that he was free to leave and did not have to answer anyone's questions. Under these circumstances, a reasonable person in his position would have concluded that submitting to the police interview was not obligatory and was not an avenue to regain custody of his children.

18

Defendant also contends that his statements to the police should have been excluded under *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*). "*Seibert* does not apply where, as here, the suspect was not in custody during the first stage of the interrogation." (*Smith v. Clark* (9th Cir. 2015) 612 Fed.Appx. 418, 421.) Since defendant was not in custody during the initial portion of the interview, *Seibert* is inapplicable.

## C. CSAAS Evidence

Defendant contends that the trial court prejudicially erred in admitting CSAAS evidence.

### 1. Background

Defendant moved in limine to exclude as irrelevant or unduly prejudicial expert testimony about CSAAS. However, at the hearing on the in limine motion, he argued only that the expert should be limited to testifying about "common myths related to child abuse" and sought only to preclude him from giving other testimony. The court ruled that the CSAAS expert would be precluded from offering testimony "regarding an opinion as to the believability" of the complaining witness or regarding "this particular complaining witness," "this defendant, their family," and "these particular incidents." The expert would be permitted to testify "as to how children in general respond to these situations . . . ." The court deferred ruling on any more specific objections until the expert testified.

Carl Lewis testified for the prosecution as an expert on CSAAS. Over a period of 25 years, Lewis had investigated hundreds of cases involving allegations of child sexual abuse, and he had testified as an expert on CSAAS about 300 times. Lewis described the "myths about child sexual abuse that may not be accurate." He explained that he knew nothing about this particular case and was merely providing "general information about

19

this topic" for the jury. "These categories are helpful in reminding us that things may not always match our preconceived ideas."

Lewis described five myths, categories, or aspects of CSAAS. One myth is that a child will always disclose the molestation. This is the "secrecy" aspect of CSAAS.[10] To keep the molestation secret, the molester may threaten the victim. Another "category" of CSAAS is "helplessness." A child's dependence on the molester may render the child unable to stop the abuse. A third category of CSAAS is the child's "entrapment and accommodation." The child may be trapped by the circumstances and learn to accommodate the abuse by acting like nothing is wrong. A fourth category is "delayed unconvincing disclosure." A molested child may delay disclosing the abuse and make an unconvincing disclosure due to the child's conflict about reporting the abuse. The fifth category is "retraction." A child molest victim may retract a claim of abuse due to the "chaos" that the disclosure has brought to the child's life.

At the prosecution's request, the court gave CALCRIM No. 1193 on CSAAS evidence. "You've heard testimony from Carl Lewis regarding child sexual abuse accommodation syndrome. [¶] Carl Lewis' testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the acts charged against him. [¶] You may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of her testimony."

---

[10] After Lewis began testifying, defendant's trial counsel asserted that CSAAS was not a proper subject for expert testimony because "[e]verybody with common sense that God gave a chicken knows this . . . ." The trial court rejected this assertion: "If it indeed is something a layperson understands I don't see any prejudicial impact with this gentleman testifying to it." "I do not find your argument that this type of testimony is within common knowledge to be persuasive." Defendant's trial counsel also objected to certain questions as "beyond the scope." Most of these objections were overruled. He does not argue on appeal that the trial court erred in overruling any of his specific objections.

The prosecutor argued to the jury that CSAAS "explains how the evidence came in. It explains Jane Doe's conduct and how her conduct was understandable and her testimony was believable and most importantly her statement to Detective Sousa was believable." "Let's talk about child sexual abuse accommodation syndrome. It's not evidence he did anything in this case as far as the crimes charged. It's not evidence against him. Mr. Lewis didn't -- he didn't read the reports. He didn't see the interviews. He was here to just sort of tell us some general concepts about child molestation and myths about child molestation which -- which assists viewing all of the evidence and it shows -- and for evaluating the believability of the testimony and the other evidence in the case." The prosecutor went through the five categories of CSAAS.

Defendant's trial counsel criticized Lewis's testimony in his argument to the jury. "[H]e's not qualified to do anything. He is basically a beat cop who got a good gig and the good gig is testifying in court to [CSAAS]. [¶] He couldn't show any studies to support his opinion and the opinion really was or should have been limited to dispelling myths commonly held. I don't know what myth he supposedly explained but he got into the, well, the children -- children generally will do A, B, C or D. I submit that that's beyond any expert witness and we don't know if it applies to Jane Doe. . . . Why don't we have somebody who examined Jane Doe come in and testify with regard to that?"

The prosecutor responded in his closing argument. "Mr. Lewis provided helpful testimony in this case. He's able to say what a common myth is about delayed reporting or about retracting because he has experience in this area and he's interviewed -- he teaches people on how to interview kids. So that's why he is qualified to provide you with evidence in this regard."

### 2. Analysis

Defendant claims that the trial court prejudicially erred in admitting the CSAAS evidence because it was irrelevant. He asserts that "nothing in the record establishes whether the jurors, or even people today generally" have any "misconceptions" about

21

how a molest victim would act. Defendant also contends that this evidence was more prejudicial than probative because the jury was "likely to draw the impermissible inference that a child who exhibits [CSAAS] symptoms has been abused . . . ." In his view, the admission of CSAAS evidence "permits the jury to infer that a child's 'not inconsistent' behavior must mean that he or she was abused."

"Although inadmissible to prove that a molestation occurred, CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation. [Citations.] [¶] Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.)

In this case, CSAAS evidence was *relevant* because all of the types of conduct addressed by CSAAS that may lead to misconceptions were present in this case. Jane kept the molestations secret for years. She acquiesced to the molestations because she believed that defendant would harm her mother. Jane accommodated the abuse in order to maintain her family relations. She delayed reporting the molestations and retracted some of her allegations at trial. Lewis's testimony about why a molest victim may engage in such conduct helped to explain what might otherwise seem to be "paradoxical behavior."

Defendant suggests that *expert testimony* was not admissible on CSAAS because it is not "beyond common experience" (Evid. Code, § 801, subd. (a)). We disagree. The behavior of child molestation victims is not within the "common experience" of most jurors or people in general. Certainly they are unlikely to be familiar with the research that has gone into identifying CSAAS.

22

Defendant's reliance on *People v. Wells* (2004) 118 Cal.App.4th 179 (*Wells*) is misplaced. In *Wells*, the prosecution presented expert testimony regarding CSAAS, and the jury was instructed that it could not use this testimony as proof that a molestation occurred. (*Wells*, at p. 186.) The defense unsuccessfully sought to rebut the CSAAS evidence with the testimony of a defense expert that one of the victims did not have the demeanor one would expect from someone who had suffered the act she described. On appeal, the defendant challenged the exclusion of the defense expert's testimony. He did not challenge the admission of the CSAAS evidence. (*Wells*, at p. 187.) The Court of Appeal rejected his challenge and held that "expert testimony concluding a complaining witness has *not* been raped or molested, based on the witness' demeanor after the alleged incident" was inadmissible. (*Wells*, at p. 189.) "[The expert's] proposed testimony about the 'usual' demeanor of trauma victims is not relevant to correct any common myth or misconception about the behavior of children who have been molested. If anything, her proposed expert testimony would likely reinforce a commonly held belief that traumatized victims will become emotionally disturbed or tearful when describing a traumatic event. Because the defense identified no common misperception the jury might hold about victim behavior that [the expert's] testimony was narrowly tailored to rebut, her proposed testimony was little more than expert opinion as to [the victim's] credibility. Jurors are generally considered to be equipped to judge witness credibility without the need for expert testimony." (*Wells*, at p. 189.)

Defendant asserts "the *Wells* court implicitly found that molestation victims do not exhibit any 'usual' behaviors or characteristics" and therefore CSAAS evidence is irrelevant. Nothing in *Wells* suggests the logical leap that defendant makes. CSAAS evidence was admitted in *Wells*, and its admission was not challenged. As the *Wells* court recognized, CSAAS evidence is properly admitted for the limited purpose of rebutting common misperceptions, and juries are instructed that it cannot be used as proof of molestation. The defense evidence found to be inadmissible in *Wells* did not seek to

23

rebut any common misperceptions and purported to provide proof that the victim was not molested. The *Wells* court plainly approved of the use of CSAAS evidence, so it obviously did not "implicitly" find that such evidence was irrelevant.

Defendant relies on authority from other states to argue that CSAAS evidence should never be admissible. California courts have long held otherwise. "'[CSAAS] expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301.)

Finally, we reject defendant's claim that the CSAAS evidence should have been excluded under Evidence Code section 352 because the jury was "likely to draw the impermissible inference that a child who exhibits [CSAAS] symptoms has been abused . . . ." Trial courts have the discretion to exclude evidence pursuant to Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

The CSAAS evidence was relevant and probative, and the risk of undue prejudice was minimal. The jury was instructed that Lewis's testimony "is not evidence that the defendant committed any of the acts charged against him," and the prosecutor admonished the jury that the CSAAS evidence was "not evidence [defendant] did anything in this case as far as the crimes charged." Lewis's testimony, the court's instruction, and the prosecutor's argument clearly informed the jury that the CSAAS evidence had a limited purpose solely to disabuse the jury of any misconceptions it might harbor about how a molestation victim might act. Under these circumstances, we must presume that the jury followed the court's instruction. (*People v. Holt* (1997) 15 Cal.4th

24

619, 662 ["Jurors are presumed to understand and follow the court's instructions."].) The trial court did not abuse its discretion in admitting the CSAAS evidence.[11]

## D. Errors in Abstract

The abstract of judgment and the minutes of the sentencing hearing state that the terms imposed by the court for counts 13 through 16 were 8-year upper terms. At the sentencing hearing, the court imposed eight-year *midterms* for counts 13 through 16. Defendant seeks correction of the abstract and minutes, and the Attorney General concedes that correction is required. We agree and will so order.

## IV. Disposition

The judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and minutes reflecting that the eight-year terms imposed for counts 13 through 16 were midterms rather than upper terms and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

---

[11] Defendant asserts that he was prejudiced by the cumulative effect of the trial court's errors. As we have found no errors, there is no prejudice to cumulate.

_____
Mihara, J.

I CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

People v. Vicente Ruiz Garcia
H040914

Grover, J.

I concur in the judgment but respectfully depart from some of the majority's reasoning in the published portion of the opinion.

Defendant contends that the evidence is insufficient to support his 16 convictions for committing a forcible lewd act on a child (Pen. Code, § 288, subd. (b)) because the second amended information alleged that the acts occurred within specified one-year increments (coinciding with the victim's birthday), but none of the acts was proven at trial to have actually occurred within any of those periods.

I agree with the majority's interpretation and application of *People v. Jones* (1990) 51 Cal.3d 294, *People v. Peyton* (2009) 176 Cal.App.4th 642, and *People v. Starkey* (1965) 234 Cal.App.2d 822, and that the precise date was not a "material ingredient" of the charged offenses. (Pen. Code, §§ 955, 288, subd. (b).) However, I do not share the view that defendant's claim of insufficient evidence is premised on pleading error. I believe the issue is more accurately described as arising from a variance between pleading and proof. As such, the critical question is whether "the variance was of such a substantial character as to have misled" defendant in preparing his defense. (*People v. Collins* (1960) 54 Cal.2d 57, 59 ["An accused should be advised of the charge against him in order that he may have a reasonable opportunity to prepare and present his defense."].) In arguing insufficiency of the evidence based on a variance between the operative charging document and proof at trial, defendant has shown neither the materiality of specific dates nor inadequate notice of the crimes alleged. I therefore reach the same conclusion as the majority.

_____

Grover, J.

*People v. Garcia*
H040914

| Trial Court: | Santa Cruz County Superior Court |
| Trial Judge: | Honorable Timothy R. Volkmann |
| Attorney for Defendant/Appellant: | Jeffrey A. Glick<br>Under Appointment by the Sixth<br>District Appellate Program |
| Attorneys for Plaintiff/Respondent: | Kamala D. Harris<br>Attorney General of California |

Attorney for Defendant/Appellant:     Jeffrey A. Glick
                                       Under Appointment by the Sixth
                                       District Appellate Program

Attorneys for Plaintiff/Respondent:    Kamala D. Harris
                                       Attorney General of California

                                       Gerald A. Engler
                                       Chief Assistant Attorney General

                                       Jeffrey M. Laurence
                                       Acting Senior Assistant Attorney General

                                       Rene A. Chacon
                                       Supervising Deputy Attorney General

                                       Allan Yannow
                                       Deputy Attorney General

People v. Garcia
H040914